UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

METRO PONY, LLC,

          Plaintiff,

      v.                        Case No. 11-cv-144-JPG

CITY OF METROPOLIS,

          Defendant.

## MEMORANDUM AND ORDER

This matter comes before the Court on the motion for summary judgment filed by

defendant City of Metropolis ("the City") (Doc. 47).  Plaintiff Metro Pony, LLC has responded

to the motion (Doc. 51), and the City has replied to that response (Doc. 52).  Summary judgment

is appropriate where "the movant shows that there is no genuine dispute as to any material fact

and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a);  *see Celotex*

*Corp. v. Catrett*, 477 U.S. 317, 322 (1986);  *Spath v. Hayes Wheels Int'l-Ind., Inc.*, 211 F.3d 392,

396 (7th Cir. 2000).  The Court construes the evidence in the light most favorable to the

nonmoving party and draws all reasonable inferences in favor of that party.  *See Anderson v.*

*Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986);  *Chelios v. Heavener*, 520 F.3d 678, 685 (7th Cir.

2008);  *Spath*, 211 F.3d at 396.

## I.    Facts

Metro Pony, a business that offers live artistic dance performances that include nudity

and sells DVDs of a sexual nature, began operations in the City in December 2010.  Metro

Pony's brief describes the establishment as follows:

> Metro Pony is an adult cabaret that presents to its patrons artistic dance
> performances by female entertainers who, during the course of their
> performances, remove their clothing and appear fully nude.  These performances

take place on stage, at tableside and in a monitored VIP room.  The nightclub operates as a BYOB establishment; it does not serve alcohol to its patrons but does allow them to bring in their own alcohol beverages to consume.  Metro Pony presents dance performances from noon until 3:00 a.m. Sunday through Tuesday, and from noon to 5:00 a.m. on weekends.  In addition to presenting dance performances, Metro Pony also offers adult oriented DVDs for its customers to purchase for viewing in the privacy of their homes.

Pl.'s Br. 1.

In response to public petitions opposing the opening of Metro Pony, the City Council contemplated regulating sexually oriented businesses like Metro Pony.  In deciding to enact such regulations, it considered judicial opinions, crime reports, news articles, expert reports and affidavits, and it held a public hearing that included a presentation about negative secondary effects associated with sexually oriented businesses.  On February 14, 2011, the Metropolis City Council passed Ordinance 2011-2 to regulate sexually oriented businesses.

Among other things, Ordinance 2011-2 does the following:

- requires annual licensing of sexually oriented businesses and the people who work for them, Ord. §§ 117.03-117.11;

- prohibits nudity, sex and touching patrons in a sexually oriented business, Ord. §§ 117.17(a) & (c);

- requires semi-nude dancers in a sexually oriented business to remain at least six feet from patrons, on a stage 18 inches high, and in a room of at least six hundred square feet, Ord. § 117.17(b);

- prohibits sexually oriented business operations from midnight to 6 a.m., Ord. § 117.12;

- requires sexually oriented businesses to post at least two no loitering signs, inspect the premises every 90 minutes or monitor it by video, and provide sufficient lighting for such inspections, Ord. § 117.14(a);

- requires sexually oriented businesses to light interior areas where patrons are permitted to a level of five footcandles whenever a patron is present, Ord. § 117.14(b);

- prohibits sexually oriented businesses from constructing barriers such as fences or walls that hide any portion of its parking lot from public view, Ord. § 117.14(c); and

2

- prohibits the possession, use and consumption of alcohol on the premises of a sexually oriented business, Ord. § 117.17(d).

A knowing or reckless violation of any of these rules subjects the business to suspension or revocation of its license.  § 117.08-10.  A violation also subjects the business to criminal misdemeanor proceedings and civil nuisance abatement proceedings.  § 117.15.

Because of the content of the entertainment and products it offers, Metro Pony falls into Ordinance 2011-2's classification as a sexually oriented businesses.  In fact, it is the only business in the City that does.  Therefore, Ordinance 2011-2's  requirements do not apply to other businesses within the City.

The Preamble and the text of Ordinance 2011-2 offer a rationale for its adoption.  The Preamble states the City Council's finding "that sexually oriented businesses, as a category of establishments, are frequently used for unlawful sexual activities, including prostitution and sexual liaisons of a casual nature."  Ord. Preamble ¶ 2.

The text of Ordinance 2011-2 describes its purpose:

(a) *Purpose*.  It is the purpose of this chapter to regulate sexually oriented businesses in order to promote the health, safety, and general welfare of the citizens of the City, and to establish reasonable and uniform regulations to prevent the deleterious secondary effects of sexually oriented businesses within the City.  The provisions of this chapter have neither the purpose nor effect of imposing a limitation or restriction on the content or reasonable access to any communicative materials, including sexually oriented materials.  Similarly, it is neither the intent nor effect of this chapter to restrict or deny access by adults to sexually oriented materials protected by the First Amendment, or to deny access by the distributors and exhibitors of sexually oriented entertainment to their intended market.  Neither is it the intent nor effect of this chapter to condone or legitimize the distribution of obscene material.

Ord. § 117.01(a).  Ordinance 2011-2 also sets forth the findings and rationale of the City Council in adopting the law:

3

(b)  *Findings and Rationale*.  Based on evidence of the adverse secondary effects of adult uses presented in hearings and in reports made available to the City Council, and on findings, interpretations, and narrowing constructions incorporated in [numerous case decisions]; and based upon reports concerning secondary effects occurring in and around sexually oriented businesses including [numerous reports]; the City Council finds:

(1)  Sexually oriented businesses, as a category of commercial uses, are associated with a wide variety of adverse secondary effects including, but not limited to, personal and property crimes, prostitution, potential spread of disease, lewdness, public indecency, obscenity, illicit drug use and drug trafficking, negative impacts on surrounding properties, urban blight, litter, and sexual assault and exploitation.  Alcohol consumption impairs judgment and lowers inhibitions, thereby increasing the risk of adverse secondary effects.

(2)  Each of the foregoing negative secondary effects constitutes a harm which the City has a substantial government interest in preventing and/or abating. This substantial government interest in preventing secondary effects, which is the City's rationale for this chapter, exists independent of any comparative analysis between sexually oriented and non-sexually oriented businesses.  Additionally, the City's interest in regulating sexually oriented businesses extends to preventing future secondary effects of either current or future sexually oriented businesses that may locate in the City.  The City finds that the cases and documentation relied on in this chapter are reasonably believed to be relevant to said secondary effects.

The City hereby adopts and incorporates herein its stated findings and legislative record related to the adverse secondary effects of sexually oriented businesses, including the judicial opinions and reports related to such secondary effects.

Ord. § 117.01(b).

On February 23, 2011, Metro Pony brought this action pursuant to 42 U.S.C. § 1983 alleging that the City violated its First Amendment rights.  On February 24, 2011, the Court granted Metro Pony's motion for a temporary restraining order and enjoined the City from enforcing Metropolis Ordinance 2011-2 until and including March 9, 2011, when a preliminary injunction hearing was to be held (Doc. 19).  Before that hearing could be held, the City agreed not to enforce Ordinance 2011-2 until the Court ruled on dispositive motions.  In light of this agreement, the Court cancelled the preliminary injunction hearing and extended the terms of the

4

temporary restraining order by consent of the parties until a dispositive motion ruling (Doc. 24).

While awaiting a ruling on the City's dispositive motion, two investigators witnessed instances of illicit sexual behavior, including conduct that could be construed as prostitution, within Metro Pony's establishment, although they did not observe nor investigate any increased crime in the vicinity of Metro Pony. There is no record of an increase in crime or urban blight in the vicinity of Metro Pony since it began its operations.

## II.     Analysis of First Amendment Claims

The First Amendment to the United States Constitution provides "Congress shall make no law . . . abridging the freedom of speech . . . ." U.S. Const. amend. 1. The Due Process Clause of the Fourteenth Amendment makes First Amendment free speech guarantees applicable to states and their municipalities. *Gitlow v. New York*, 268 U.S. 652, 666 (1925); *Ben's Bar, Inc. v. Village of Somerset*, 316 F.3d 702, 707 (7th Cir. 2003).

*Ben's Bar* describes the two strains of jurisprudence that have developed to analyze potential First Amendment violations relating to adult entertainment regulations. *Ben's Bar*, 316 F.3d at 713. The first developed in the context of adult entertainment zoning ordinances. It began with *Young v. American Mini Theatres, Inc.,* 427 U.S. 50 (1976), and was modified by *City of Renton v. Playtime Theatres, Inc.,* 475 U.S. 41 (1986), and *City of Los Angeles v. Alameda Books, Inc.,* 535 U.S. 425 (2002). That line analyzes zoning regulations as content-neutral time, place and manner restrictions. *Ben's Bar*, 316 F.3d at 713. Under that test,

> A time, place, and manner regulation of adult entertainment will be upheld if it is "designed to serve a substantial government interest and . . . reasonable alternative avenues of communication remain available." *Alameda Books*, [535 U.S. at 434]. Additionally, a time, place, and manner regulation must be justified without reference to the content of the regulated speech and narrowly tailored to serve the government's interest. *Schultz* [*v. City of Cumberland*, 228 F.3d 831, 845 (7th Cir. 2000)].

5

*Ben's Bar*, 316 F.3d at 713-14.

The second strain of adult entertainment First Amendment analysis developed in the context of public indecency laws. It began with *Barnes v. Glen Theatre, Inc.*, 501 U.S. 560 (1991), and was modified by *City of Erie v. Pap's A.M.,* 529 U.S. 277 (2000). *Ben's Bar*, 316 F.3d at 713. Both strains of analysis have their origin in *United States v. O'Brien*, 391 U.S. 367 (1968), which is still the framework for analyzing indecency laws. *Ben's Bar*, 316 F.3d at 713.

> Under the *O'Brien* test, a governmental regulation is sufficiently justified, despite its incidental impact upon expressive conduct protected by the First Amendment, if: (1) it is within the constitutional power of the government; (2) it furthers an important or substantial governmental interest; (3) the governmental interest is unrelated to the suppression of free speech; and (4) the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest.

*Id.* (citing *O'Brien*, 391 U.S. at 377).

Although these lines of analysis are articulated differently, for all practical purposes, the distinction between the *O'Brien* framework and the *Renton/Alameda Books* framework is irrelevant. *Id.* (citing *Barnes*, 501 U.S. at 566 (plurality opinion)).

In *Ben's Bar*, the Court set forth the elements that must be met where, as in this case, an adult entertainment restriction does not fall neatly into the category of a zoning or indecency regulation. For the restriction to be upheld, it must be shown that:

> (1) the State is regulating pursuant to a legitimate governmental power, (2) the regulation does not completely prohibit adult entertainment, (3) the regulation is aimed not at the suppression of expression, but rather at combating the negative secondary effects caused by adult entertainment establishments, and (4) the regulation is designed to serve a substantial government interest, narrowly tailored, and reasonable alternative avenues of communication remain available, *or,* alternatively, the regulation furthers an important or substantial government interest and the restriction on expressive conduct is no greater than is essential in furtherance of that interest.

*Id.* at 722 (citing *O'Brien*, 391 U.S. at 377; *Renton*, 475 U.S. at 46; *Pap's A.M.*, 529 U.S. at

289-91; *Alameda Books*, 535 U.S. at 434 (plurality opinion); *id.* at 444-53 (Kennedy, J.,

concurring)); *accord Joelner v. Village of Washington Park*, 508 F.3d 427, 431 (7th Cir. 2007).

If an ordinance does not satisfy these four elements, it is presumptively invalid and strict

scrutiny applies. *Ben's Bar*, 316 F.3d at 723; *Joelner*, 508 F.3d at 431.

A.   <u>Pursuant to Legitimate Government Power</u>

As to the first element, aside from First Amendment questions, there is no suggestion that

enactment of Ordinance 2011-2 is beyond the City's legitimate police powers. *See  United

States v. O'Brien*, 391 U.S. 367, 377 (1968); *Ben's Bar, Inc. v. Village of Somerset*, 316 F.3d

702, 722 (7th Cir. 2003).

B.   <u>Complete Ban</u>

As for the second element, Ordinance 2011-2 does not completely prohibit sexually

oriented businesses.  Although it bans nude dancing, expressive conduct that falls "within the

outer ambit of the First Amendment," the prohibition is aimed at conduct, not speech, has a *de

minimis* effect on expression and does not violate the First Amendment. *City of Erie v. Pap's

A.M.,* 529 U.S. 277, 294 (2000) (plurality opinion); *id.* at 307-10 (Scalia, J., concurring); *G.M.

Enters. v. Town of St. Joseph, Wisc.*, 350 F.3d 631, 636 (7th Cir. 2003); *Ben's Bar, Inc. v.

Village of Somerset*, 316 F.3d 702, 708 (7th Cir. 2003); *see Barnes v. Glen Theatre, Inc.*, 501

U.S. 560, 565 (1991) (plurality opinion); *id.* at 572 (Scalia, J., concurring); *id.* at 582, 585

(Souter, J., concurring).  Likewise, there is no First Amendment right to consume alcohol during

an expressive dance performance or to have physical contact between dancers and patrons so

long as the business still has a reasonable opportunity to convey its erotic message. *G.M.

Enters.*, 350 F.3d at 636; *Ben's Bar*, 316 F.3d at 724, 726.  Other restrictions contained in

Ordinance 2011-2 do not even arguably ban protected speech (licensure requirements, hours of

operation, physical premises requirements, etc.) but instead are time, place and manner restrictions.

However, because Ordinance 2011-2 has an impact on protected expression, the Court must move to the third element and examine whether Ordinance 2011-2 was aimed at suppressing expression or combating negative secondary effects caused by sexually oriented businesses.  This will determine whether the Court will apply intermediate or strict scrutiny to the regulation impacting speech.  *City of Los Angeles v. Alameda Books, Inc.,* 535 U.S. 425, 434 (2002) (plurality opinion);  *id.* at 448-49 (Kennedy, J., concurring);  *Pap's A.M.*, 529 U.S. at 294-96 (plurality opinion); *id.* at 310 (Souter, J., concurring in part and dissenting in part);  *City of Renton v. Playtime Theatres, Inc.,* 475 U.S. 41, 48 (1986);  *Ben's Bar*, 316 F.3d at 723-74.

C.    Predominant Purpose of Ordinance

As noted above, if the predominant concern motivating the ordinance was reducing secondary effects that flow from the speech impacted by the regulation and not suppressing the speech itself, the Court applies intermediate scrutiny.  *City of Los Angeles v. Alameda Books, Inc.*, 535 U.S. 425, 434 (2002) (plurality opinion);  *id.* at 448-49 (Kennedy, J., concurring);  *G.M. Enters. v. Town of St. Joseph, Wisc.*, 350 F.3d 631, 637-38 (7th Cir. 2003);  *Ben's Bar, Inc. v. Village of Somerset*, 316 F.3d 702, 723 (7th Cir. 2003).  Otherwise, strict scrutiny applies.  *RVS, LLC v. City of Rockford*, 361 F.3d 402, 407 (7th Cir. 2004);  *Ben's Bar*, 316 F.3d at 723.  In making the decision about the predominant purpose of a regulation, the Court can consider "a wide variety of materials including, but not limited to, the text of the regulation or ordinance, any preamble or express legislative findings associated with it, and studies and information of which legislators were clearly aware."  *Ben's Bar*, 316 F.3d at 723, n. 28.

The City points to the text and preamble of Ordinance 2011-2 as evidence that its

8

predominant concern was to combat the secondary effects associated with sexually oriented

businesses.  Specifically, § 117.01(a) sets forth Ordinance 2011-2's purpose "to regulate

sexually oriented businesses in order to promote the health, safety, and general welfare of the

citizens of the City, and to establish reasonable and uniform regulations to prevent the

deleterious secondary effects of sexually oriented businesses within the City."  That section

further acknowledges that the purpose is *not* to limit the content or access to speech.  Similarly, ¶

2 of the Preamble to Ordinance 2011-2 acknowledges that sexually oriented businesses "are

frequently used for unlawful sexual activities, including prostitution and sexual liaisons of a

casual nature."  The City also points to the City Council's legislative findings that sexually

oriented businesses "are associated with a wide variety of adverse secondary effects including,

but not limited to, personal and property crimes, prostitution, potential spread of disease,

lewdness, public indecency, obscenity, illicit drug use and drug trafficking, negative impacts on

surrounding properties, urban blight, litter, and sexual assault and exploitation."  Ord. §

117.01(b)(1).  The City Council further found that the consumption of alcohol increases the risk

of those secondary effects.  *Id.*  It incorporated a voluminous legislative record containing

judicial opinions, reports, articles and affidavits in support of its conclusion that sexually

oriented businesses caused adverse secondary effects and that Ordinance 2011-2 was likely to

reduce those secondary effects.  *Id.* at § 117.01(b)(2).  The City notes that Ordinance 2011-2

does not completely prohibit an erotic message but merely imposes restrictions on the

circumstances of its delivery.

Metro Pony points to a provision in Ordinance 2011-2 stating that the City's interest in

preventing the secondary effects associated with sexually oriented businesses "exists

independent of any comparative analysis between sexually oriented and non-sexually oriented

businesses." Ord. § 117.01(b)(2). It claims that this provision belies a predominant motive to combat secondary effects because it essentially admits that the City was committed to regulating sexually oriented businesses regardless of whether the secondary effects they caused were greater or lesser than those caused by other businesses. It is, Metro Pony argues, an acknowledgment that Ordinance 2011-2 is "wildly underinclusive when judged against its asserted justification," *Brown v. Entertainment Merchs. Ass'n*, 131 S. Ct. 2729, 2740 (2011), and thus shows the City was not truly motivated by combating negative secondary effects. In *Brown*, the Supreme Court struck down an ordinance restricting the sale of violent video games to minors but not restricting other depictions of violence. *Id.* at 2739-40 (applying strict scrutiny). The Court noted, "Underinclusiveness raises serious doubts about whether the government is in fact pursuing the interest it invokes, rather than disfavoring a particular speaker or viewpoint." *Id.* at 2740.

Metro Pony also cites *Annex Books, Inc. v. City of Indianapolis ("Annex Books I")*, 581 F.3d 460, 463 (7th Cir. 2009), in support of the proposition that an ordinance restricting sexually oriented businesses cannot be constitutional if more negative secondary effects occurred at non-sexually oriented businesses. In that case, the Court of Appeals applied intermediate scrutiny and found there was an insufficient connection between the restriction effecting speech and the evidence offered by the municipality in issue. *Id.* at 462-64.

Finally, *Metro Pony* cites *Joelner v. Village of Washington Park*, 508 F.3d 427, 432 (7th Cir. 2007), for the proposition that mere references to combating negative secondary effects in an ordinance or in its legislative history do not ensure its primary motive was actually combating negative secondary effects. In *Joelner*, the district court found after a trial that a scanty legislative history, suspicious circumstances surrounding the refusal to issue an adult cabaret

10

license, other conduct that appeared likely to increase negative secondary effects in a town where the sole economic driver is adult cabarets belied an intent to combat negative secondary effects of sexually oriented businesses, despite language in the ordinance to the contrary.  *Id.* The district court instead found that the predominant purpose of the ordinance was to protect existing adult cabarets from competition.  *Id.*

The Preamble and text of Ordinance 2011-2 and the legislative findings based on a voluminous record of evidence linking sexually oriented businesses to negative secondary effects show that the City's predominant motive in enacting Ordinance 2011-2 was to combat negative secondary effects by restricting the circumstances of speech – that is, by reducing the factors it believed made the secondary effects more likely.  These factors include alcohol consumption, late hours, proximity between dancers and patrons, full nudity, dark and/or hidden spaces, and employees with a history of committing crimes.

This is so notwithstanding the provision of Ordinance 2011-2 highlighted by Metro Pony purportedly disavowing reliance on the relative frequency of secondary effects at sexually oriented businesses.  In *Brown*, there was evidence of substantial underinclusiveness in the regulation of speech depicting violence.  However, there is no evidence showing that Ordinance 2011-2 is "wildly underinclusive" in that negative secondary effects occurred more frequently at non-sexually oriented businesses.  Thus, Metro Pony's *Brown*-based argument is a straw man and does not reveal any animus toward sexually oriented businesses.  Even if there were such evidence, it is only relevant to a later stage of the constitutional inquiry where the Court considers whether the evidence considered reasonably supports the justification for the regulation.  *See Alameda Books*, 535 U.S. at 440-41 (plurality opinion).  Indeed, in *Brown*, the Court addressed the question in the application of strict scrutiny, not in an inquiry as to the

11

purpose of the regulation.

Similarly, in *Annex Books I*, the Court of Appeals' decision focused on the later stage of the constitutional analysis – application of intermediate scrutiny – not the stage at which the purpose of the regulation was determined.  *Annex Books I*, 581 F.3d at 463.  Indeed, the District Court had already determined the regulation in question was aimed at reducing negative secondary effect and was therefore subject to intermediate scrutiny, *Annex Books, Inc. v. City of Indianapolis*, 333 F. Supp. 2d 773, 783 (S.D. Ind. 2004), a decision the Court of Appeals did not disturb.

As for *Joelner*, that case is factually distinguishable from the case at bar.  Here, unlike in *Joelner*, there is a large legislative record demonstrating the purpose of combating negative secondary effects.  There are also no circumstances – like a surrounding community of nearly exclusively sexually oriented businesses, other conduct by the City that would be likely to *increase* negative secondary effects, or a credible alternative motivation like the prevention of competition for politically powerful existing sexually oriented businesses – that suggest the City's expressed motives are disingenuous.  *Joelner* is, indeed, in a class of its own.

In this case, the fact remains that the record is replete with evidence the City considered showing an association between sexually oriented businesses and negative secondary effects, and the City has avowed its intention to reduce those effects by the restrictions it enacted.  Its stated purpose cannot be impugned because it did not regulate more broadly.  In light of the record in this case, it is clear that Ordinance 2011-2 was aimed at reducing negative secondary effects and that intermediate scrutiny should apply.

D.    Intermediate Scrutiny

When the Court applies intermediate scrutiny, it asks whether the regulation is narrowly

tailored to serve a substantial government interest while not unreasonably limiting alternative avenues of communication, *City of Los Angeles v. Alameda Books, Inc.*, 535 U.S. 425, 434 (2002) (plurality opinion); *id*. at 444-53 (Kennedy, J., concurring), or whether the regulation furthers an important or substantial government interest while imposing a restriction that is no greater than is essential to further that interest, *City of Erie v. Pap's A.M.*, 529 U.S. 277, 294 (2000) (plurality opinion); *id.* at 310 (Souter, J., concurring in part and dissenting in part).  *Ben's Bar, Inc. v. Village of Somerset*, 316 F.3d 702, 722 (7th Cir. 2003).

> a.  <u>Substantial Government Interest:  Connection Between Secondary Effects and Speech</u>

Substantial government interests include the types of interests for which Ordinance 2011-2 was passed in this case (*e.g.*, the prevention of unlawful sexual activities, crime and urban blight).  *See City of Los Angeles v. Alameda Books, Inc.*, 535 U.S. 425, 435 (2002) (plurality opinion) (substantial government interests can include preserving the quality of urban life and reducing crime); *id.* at 444 (Kennedy, J., concurring).  However, in order to withstand intermediate scrutiny, there must be a connection between the negative secondary effects and the regulated speech.  *Alameda Books*, 535 U.S. at 441 (plurality opinion);  *Ben's Bar*, 316 F.3d at 724;  *RVS*, 361 F.3d at 408.

In *Alameda Books*, Justice Kennedy's concurrence breaks this inquiry into two separate questions:  (1) What is the proposition that a city needs to advance in order to sustain a secondary effects ordinance? and (2) How much evidence is required to support the proposition? *Alameda Books*, 535 U.S. at 449-50 (Kennedy, J., concurring);  *Ben's Bar*, 316 F.3d at 724.

The proposition must be that the regulation of the speech significantly reduces the secondary effects without substantially reducing the speech or causing the speech to cease.

*Alameda Books*, 535 U.S. at 449 (Kennedy, J., concurring) ("[A] city may not assert that it will reduce secondary effects by reducing speech in the same proportion.");  *Ben's Bar*, 316 F.3d at 724.  Fundamental to this proposition is the assumption that the regulated aspect of the speech (*e.g.*, the regulated conduct, the lack of licensing) causes, or is reasonably believed to cause, the secondary effects.  *See Annex Books, Inc. v. City of Indianapolis ("Annex Books I")*, 581 F.3d 460, 462-63 (7th Cir. 2009) (rejecting the proposition that "any empirical study of morals offenses near any kind of adult establishment in any city justifies every possible kind of legal restriction in every city").  In this case, the proposition must be that the objects of the restrictions in Ordinance 2011-2 (*e.g.*, licensing of businesses and employees, inspections, hours of operation, viewing booth requirements, loitering restrictions, lighting requirements, monitoring requirements, no touch/stage/room size requirements, alcohol ban) lead to negative secondary effects and that the restrictions may reduce those secondary effects without unreasonably limiting the protected speech.

To support the necessary proposition, a municipality "may rely on any evidence that is 'reasonably believed to be relevant' for demonstrating a connection between speech and a substantial, independent government interest."  *Alameda Books*, 535 U.S. at 438 (plurality opinion) (citing *City of Renton v. Playtime Theatres, Inc.,* 475 U.S. 41, 51-52 (1986)).  The evidence need not be sufficient to satisfy the demanding evidentiary standard of *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579 (1993).  *Alameda Books,* 535 U.S. at 439 (plurality opinion);  *G.M. Enters. v. Town of St. Joseph, Wisc.*, 350 F.3d 631, 640 (7th Cir. 2003).  The standard is not particularly demanding; the municipality need produce "very little" evidence to satisfy its burden.  *Alameda Books*, 535 U.S. at 451 (Kennedy, J., concurring);  *RVS, LLC v. City of Rockford*, 361 F.3d 402, 411 (7th Cir. 2004).  "The Supreme Court has consistently held, 'a

14

city must have latitude to experiment, at least at the outset, and . . . very little evidence is required [to support an ordinance's proposition].'" *RVS*, 361 F.3d at 411 (quoting *Alameda Books*, 535 U.S. at 451 (Kennedy, J., concurring)); *accord Alameda Books*, 535 U.S. at 439 (plurality opinion); *Renton*, 475 U.S. at 52.  If a city's conclusions appear reasonable, the Court should not find that they are unsupported.  *Alameda Books*, 535 U.S. at 452 (Kennedy, J., concurring)).

The evidence can include, among other things, studies, judicial opinions and experience-based testimony.  *RVS*, 361 F.3d at 411.  Furthermore, it is not necessary that the rule-makers actually have considered the evidence when they passed the ordinance so long as the evidence supports the necessary proposition.  *RVS*, 361 F.3d at 411 n. 6; *compare Alameda Books*, 535 U.S. at 442 (plurality opinion) (leaving question open).

Shoddy data or reasoning, however, is insufficient, and a party opposing the ordinance can cast doubt on the rationale for it "either by demonstrating that the municipality's evidence does not support its rationale or by furnishing evidence that disputes the municipality's factual findings." *Alameda Books*, 535 U.S. at 438-39 (plurality opinion).  If the party opposing the regulation is able to cast doubt on the rationale, the burden shifts back to the municipality to supplement the record with further evidence.  *Id.* at 439.

The City points to the extensive legislative record it considered in adopting Ordinance 2011-2.  That record includes caselaw, studies/reports, news articles, affidavits of investigators and a presentation to the City Council to support each of the restrictive components of Ordinance 2011-2.  It further argues that Metro Pony does not have standing to challenge the individual licensure requirements since it has not pled or proved that it or any of its employees would be disqualified from being licensed thereunder.  Finally, the City believes the report of Dr. Daniel

Linz does not call into question the City's evidentiary basis for Ordinance 2011-2 or disprove its factual findings.  That study, it argues, focuses on zoning regulations and not regulations like the City's that are designed to prevent illicit sexual behavior inside sexually oriented businesses.  The City also argues Dr. Linz's study does not rebut *all* of the evidence upon which it relied, including judicial opinions, leaving some of the City's supporting evidence unchallenged.  The City further submits two post-enactment affidavits attesting to prostitution activity occurring inside Metro Pony's establishment.

In response, Metro Pony points to Dr. Linz's 48-page report stating that much of the evidentiary material relied on by the City is shoddy because the studies are unsound and/or flawed in their design and data collection methods such that they do not provide scientifically reliable conclusions.  Others, Linz claims, reach conclusions contrary to those for which the City relied on them.  Metro Pony specifically points to Dr. Linz's criticism of the following studies:

- An Analysis of the Effects of SOBs on the Surrounding Neighborhoods in Dallas, Texas as of April 1997, prepared by Peter Malin, MAI (Linz Decl. at 12);

- Report on Secondary Effects of the Concentration of Adult Use Establishments in the Times Square Area, prepared by Insight Associates, April 1994 (Linz Decl. at 23-27);

- Report of the Attorney General's Working Group on the Regulation of Sexually Oriented Businesses, Hubert H. Humphrey, III, Attorney General, State of Minnesota, June 6, 1989 (Linz Decl. at 27);

- St. Paul, 1978 (Linz Decl. at 28-31)

- The Relationship Between Crime and Adult Business Operations on Garden Grove Boulevard, prepared by Richard McCleary, Ph.D. and James W. Meeker, J.D., Ph.D., October 23, 1991 (Linz Dec. at 7-9);

- A methodological critique of the Linz-Yao report: Report to the Greensboro City Attorney by Richard McCleary, Ph.D. December 15, 2003 (Linz Decl. at 13-14);

- Crime-Related Secondary Effects of Sexually-Oriented Businesses: Report to the Jackson County Legislature, Richard McCleary, Ph.D., May 9, 2008 (Linz Decl. at 15-19);

- Dallas, Texas 2007 (Linz Decl. at 31); and

- "Rural Hotspots: The Case of Adult Businesses," 19, Criminal Justice Policy Review, 153 (2008) (Linz Decl. at 33-34).

While Linz faults the foregoing studies[1] for failing to be empirical studies and for failing to be conducted with strict scientific rigor, the law does not demand that they be.  All it requires is that the evidence reasonably link the regulation to the negative secondary effects the regulation purports to avoid.  *Alameda Books,* 535 U.S. at 439 (plurality opinion);  *G.M. Enters.*, 350 F.3d at 639, 640.

More importantly, even if the Court were to disregard the studies cited above, the City has provided other evidence of the reasonableness of its belief in the connection between negative secondary effects and the restrictions imposed by Ordinance 2011-2.  *See, e.g., 84 Video/Newsstand, Inc. v. Sartini*, No. 09–3920, 2011 WL 3904097, * 9 (6th Cir. 2011) (finding doubt cast by Dr. Linz's studies insufficient to create genuine issue of material fact where other unchallenged evidence existed);  *compare Annex Books, Inc. v. City of Indianapolis ("Annex Books II")*, 624 F.3d 368, 369-70 (7th Cir. 2010) (*per curiam*) (genuine issue of material fact created when Dr. Linz cast doubt on *sole study* relied on by municipality).  For example, regarding the licensure requirements, *Schultz v. City of Cumberland*, 228 F.3d 831, 851-54 (7th Cir. 2000), describes in the context of a strip club (like Metro Pony's establishment) the connection between a licensing scheme and negative secondary effects.  The Houston 1997

---

[1]To the extent Dr. Linz criticizes other evidence relied on by the City, Metro Pony has not pointed the Court to that criticism in the 48-page report, so the Court does not consider it.  It is not the Court's function to "scour the record in search of evidence to defeat a motion for summary judgment."  *Bombard v. Fort Wayne Newspapers, Inc.*, 92 F.3d 560, 562 (7th Cir. 1996).

Report further finds that licensing can deter prostitution in sexually oriented businesses.  This and other evidence cited by the City connects licensing with reducing negative secondary effects.  Metro Pony has not argued or pointed to any part of Dr. Linz's report to cast any doubt on that evidence, which appears to fairly match up negative secondary effect with the restrictive components of Ordinance 2011-2.[2]  Metro Pony has not cast doubt on the City's rationale for those restrictions by demonstrating that the City's evidence does not support its rationale.

Metro Pony also points to studies Dr. Linz and others have done to show sexually oriented businesses do not create negative secondary effects (Linz Decl. at 35-48).  It faults the City for not considering this research when deciding whether to adopt Ordinance 2011-2.

However, in the absence of any glaring red flags in the reports and other evidence it considered, the City was not required to scour the nation to find reports that contradict the evidence before it.  The evidence it considered was reasonably reliable and supported Ordinance 2011-2.  Even had the City considered Dr. Linz's reports, that would not have rendered its reliance on other reports unreasonable.  The *G.M. Enterprises* court addressed just such a situation.  There, the plaintiff submitted evidence that could arguably have undermined a town

---

[2]The Court notes that Metro Pony attacks Ordinance 2011-2 with a club rather than a scalpel.  It generally faults the quality of some of the evidence relied on by the City but it does not attack any of the specific requirements of Ordinance 2011-2 as unsupported by or unconnected to the evidence cited by the City.  This is the type of flaw at the heart of *Annex Books, Inc. v. City of Indianapolis, Ind.*, 581 F.3d 460, 462-63 (7th Cir.2009), *Abilene Retail #30, Inc. v. Board of Commissioners of Dickinison County*, 492 F.3d 1164, 1175-76 (10th Cir. 2007), and *New Albany DVD, LLC v. City of New Albany*, 581 F.3d 556, 559-61 (7th Cir. 2009), *cert. denied*, 130 S. Ct. 3410 (2010).  Yet, Metro Pony does not argue that any specific restriction in Ordinance 2011-2 (say, for example, the requirement that a licensee be fingerprinted) is unsupported by the materials on which the City relied to pass the ordinance.  Where Metro Pony fails to make this kind of argument, the Court will not make the argument for it.  *See United States v. McClellan*, 165 F.3d 535, 550 (7th Cir. 1999) (courts are not "in the business of formulating arguments for the parties").

board's rationale underlying its adoption of restrictions on sexually oriented businesses.  The Court of Appeals noted:

> Although this evidence shows that the Board might have reached a different and equally reasonable conclusion regarding the relationship between adverse secondary effects and sexually oriented businesses, it is not sufficient to vitiate the result reached in the Board's legislative process.

*G.M. Enters.*, 350 F.3d at 639.  The Court is not to reweigh evidence or to substitute its judgment for the municipal governing body's.  *Id.* at 640.  On the contrary, it is only to determine whether that body's decision was supported by evidence "'reasonably believed to be relevant' for demonstrating a connection between speech and a substantial, independent government interest." *Alameda Books*, 535 U.S. at 438 (plurality opinion) (citing *Renton*, 475 U.S. at 51-52).  In this case, it was.

Finally, Metro Pony argues that the lack an increase in crime around its establishment in the first ten months it was open shows the City's rationale is unreasonable.  However, in light of the unchallenged evidence the City considered in passing Ordinance 2011-2 and the affidavits of Mike Oyler and Gary Darnell attesting to prostitution activity in Metro Pony's establishment after the Ordinance was passed, this is not enough to call into question the City's reasonable reliance on a connection between the restrictions in Ordinance 2011-2 and negative secondary effects.[3]

In sum, the Court finds that there is no genuine issue of material fact about whether the City relied on evidence reasonably believed to be relevant to demonstrate a connection between the restrictions in Ordinance 2011-2 and negative secondary effects, and Metro Pony has not cast

---

[3]Dr. Linz might agree that the admittedly short period of observation – ten months – is insufficient to yield conclusive results (*See* Linz Decl. at 4, ¶12).

doubt on the City's rationale such that the burden is shifted to the City to supplement the record with further evidence.

The Court now turns to the question of whether the Ordinance leaves the "'quantity and accessibility of speech substantially intact.'" *RVS*, 361 F.3d at 408 (quoting *Alameda Books*, 535 U.S. at 449 (Kennedy, J., concurring)), that is, whether it is narrowly tailored and whether it leaves adequate alternative avenues of communication.

b.    <u>Narrow Tailoring</u>

An ordinance is narrowly tailored if it "advance[s] a substantial interest that would be achieved less effectively absent the restrictions, and the restrictions do not 'burden substantially more speech than is necessary' for such advancement." *Pleasureland Museum, Inc. v. Beutter*, 288 F.3d 988, 1002 (7th Cir. 2002) (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 799 (1989)); *see, e.g., RVS, LLC v. City of Rockford*, 361 F.3d 402, 413 (7th Cir. 2004) (holding that regulation is not narrowly tailored because it could be applied to cover mainstream speech). Narrow tailoring does not require the least restrictive means of serving the interest at issue. *Pleasureland*, 288 F.3d at 1002.  The Court should also consider whether the regulation targets the expressive conduct itself or the non-expressive aspects of the speech such as location or signage. *See, e.g., G.M. Enters. v. Town of St. Joseph*, 350 F.3d 631, 638 (7th Cir. 2003) (ordinance aimed at minimizing non-expressive factors that heightened the probability of adverse secondary effects, not the speech itself).

There is no genuine issue of material fact about whether Ordinance 2011-2 is narrowly tailored.  It does not prohibit erotic dancing – which is still available, just not at all hours and under any conditions – but instead targets non-expressive aspects of sexually oriented businesses.  Furthermore, the restrictions in Ordinance 2011-2 are aimed at advancing the

substantial government interest of curtailing negative secondary effects associated with sexually oriented businesses.  That it may not be the least restrictive means of serving that interest is immaterial.

> c.   Alternative Avenues of Communication

The Court must consider whether Ordinance 2011-2 allows Metro Pony reasonable adequate alternative avenues of communication.  *Alameda Books*, 535 U.S. at 434 (plurality opinion) (citing *Renton*, 475 U.S. at 50).  A regulation cannot effectively deny an adult bookstore a reasonable opportunity to operate.  *Id.* at 54.

Metro Pony argues that Ordinance 2011-2 will be so economically burdensome that it will force it to stop presenting dance performances that subject it to the ordinance, depriving the Metropolis community of erotic dance messages.

This argument is not persuasive.  While the First Amendment guarantees Metro Pony "a reasonable opportunity to disseminate the speech at issue[, . . . a] reasonable opportunity does not include a concern for economic considerations."  *Ben's Bar, Inc. v. Village of Somerset*, 316 F.3d 702, 726-27 (7th Cir. 2003) (internal quotations and citations omitted).

In sum, irrespective of Metro Pony's economic considerations, under Ordinance 2011-2 it will still have a fair opportunity to present an erotic dance message during limited times of day and in prescribed circumstances.  The message will not be substantially burdened by those restrictions.

For these reasons, the Court finds that Ordinance 2011-2 does not violate Metro Pony's First Amendment rights and the City is entitled to summary judgment on that claim.

## III.   Analysis of Other Constitutional Claims

The City argues that Metro Pony's prior restraint, equal protection, overbreadth and

vagueness challenges have no merit, and Metro Pony does not dispute this in its response.  It has therefore waived objection to summary judgment as to these claims.  *See Spath v. Hayes Wheels Int'l-Ind., Inc.*, 211 F.3d 392, 397 (7th Cir. 2000) (perfunctory, underdeveloped and unsupported arguments are waived); *Perry v. Sullivan*, 207 F.3d 379, 382 (7th Cir. 2000).

**IV.    Conclusion**

For the foregoing reasons, the Court:

- **GRANTS** the City's motion for summary judgment (Doc. 47);

- **ORDERS** that the temporary restraining order prohibiting enforcement of Ordinance 2011-2 issued on February 24, 2011 (Docs. 19 & 24) be dissolved at 12:01 a.m. on Monday, April 23, 2012; and

- **DIRECTS** the Clerk of Court to enter judgment accordingly.

**IT IS SO ORDERED.**
**DATED:  April 20, 2012**

s/ J. Phil Gilbert
**J. PHIL GILBERT**
**DISTRICT JUDGE**